**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**KEVIN BRADLEY HALL,**

      **Plaintiff,**

**v.**                                  **Case No.: 2:18-cv-00302**

**NANCY A. BERRYHILL,
Deputy Commissioner for Operations,
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13, 14). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED;** the Commissioner's request for judgment on the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED;** and this

case be **DISMISSED** and removed from the docket of the Court.

## I.   Procedural History

On July 18, 2014, Plaintiff Kevin Bradley Hall ("Claimant"), completed an application for DIB alleging a disability onset date of June 29, 2012 due to "left foot injury, multiple surgeries, hypertension, high cholesterol, diabetes, anxiety, and sleeping problems." (Tr. at 183, 223). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 117-21, 125-27). Claimant filed a request for an administrative hearing on April 16, 2015. (Tr. at 128). Claimant added an application for SSI on March 9, 2017. (Tr. at 197). The administrative hearing was held on April 4, 2017 before the Honorable M. Drew Crislip, Administrative Law Judge ("ALJ"). (Tr. at 36-77). At the hearing, Claimant amended his disability onset date to March 1, 2013. (Tr. at 18, 47). By written decision dated April 28, 2017, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 18-29). The ALJ's decision became the final decision of the Commissioner on December 16, 2017 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision, to which Claimant filed a Reply. (ECF Nos. 12, 13, 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 39 years old on his amended disability onset date and 44 years old on the date of the ALJ's decision. (Tr. at 88). Claimant, who communicates in English,

graduated from high school and attended vocational training in 1992 to become a welder. (Tr. at 222). Claimant previously worked as a laborer, pipe fitter, and a home caregiver. (Tr. at 224).

III. **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In the present case, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2019. (Tr. at 20, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 1, 2013, the alleged amended disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "fracture of left foot, obesity, diabetes mellitus, diabetic neuropathy, sleep apnea, and chronic obstructive pulmonary disease (COPD)." (*Id.,* Finding No. 3). The ALJ also considered Claimant's hypertension, hyperlipidemia, IBS, mental health disorders, and GERD, but found them non-severe. (*Id.* at 21-22).

4

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-23, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift and carry 20 pounds occasionally and 10 pounds frequently. He can sit for 6 hours in an 8-hour day, and can stand and/or walk for up to 2 hours in an 8-hour day. He generally requires an assistive device to walk. He can operate foot controls with the left foot occasionally. He can occasionally climb ramps and stairs; but can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can never work at unprotected heights or around moving mechanical parts. He cannot operate a motor vehicle. He can work in weather, humidity, and wetness occasionally. He can occasionally work around dust, fumes, odors, extreme cold, extreme heat, and vibration. In addition, he needs to use oxygen constantly.

(Tr. at 23-27, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work (Tr. at 27-28, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education, in combination with his RFC, to determine his ability to engage in substantial gainful activity. (Tr. at 28, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 28, Finding Nos. 7-9). Given these factors and Claimant's RFC, and with the assistance of a Vocational Expert ("VE"), the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 28, Finding No. 10). The ALJ determined that despite Claimant's additional limitations, which eroded the light unskilled occupational base, he was still

5

capable of performing the requirements of representative occupations such as charge account clerk, telephone quotation clerk, and document preparer. (Tr. at 29). Accordingly, the ALJ found that Claimant was not disabled under the Social Security Act. (*Id.,* Finding No. 11).

IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the validity of the ALJ's decision. First, he argues that the ALJ erred by relying on the VE's opinion that Claimant could work, without considering the VE's testimony that Claimant's need to use a cane and carry a portable oxygen tank would require a special accommodation from his employer. (ECF No. 12 at 1). Claimant cites to a number of cases, which he contends stand for the proposition that ALJs are not permitted to consider "reasonable accommodations" under the Americans with Disabilities Act ("ADA") when determining a claimant's disability status. (*Id.* at 8). While Claimant acknowledges that the ALJ included Claimant's need to use oxygen and reliance on a cane in his RFC finding, Claimant believes that the ALJ failed to appreciate and acknowledge that these limitations would require a special accommodation from employers. (*Id.* at 10). According to Claimant, the ALJ was precluded from relying on the VE's opinion that Claimant could work, because the VE improperly presumed that employers would grant Claimant special accommodation. (*Id.* at 11). Therefore, as the ALJ was not entitled to consider potential accommodation in determining disability status, the ALJ's finding at step five being was unsupported by substantial evidence. (*Id.*).

Second, Claimant argues that the ALJ did not appropriately assess Claimant's need to use an assistive device to walk while simultaneously carrying a portable oxygen tank. Claimant argues that managing both of these devices at once precludes him from using his hands to work when standing and walking, a fact that the ALJ failed to resolve at step

6

five of the sequential process. (ECF Nos. 12 at 10, 14 at 4-5).

In response, the Commissioner contends that Claimant is "wrong on the facts and the law." (ECF No. 13 at 8). The Commissioner argues that Claimant is misreading the law, and that ALJs are not, in fact, precluded from considering the effect of reasonable work place accommodations. The Commissioner cites a number of cases supporting this position. (*Id.* at 9). The Commissioner asserts that the ALJ appropriately relied on the VE's testimony to determine that Claimant would be able to find employment in a significant number of jobs in the national economy. (ECF No. 13 at 12).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The information most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

On June 29, 2012, Claimant injured his left foot after falling off a motor at work. (Tr. at 317). Pamela Philips, M.D., examined Claimant's foot at Southridge Health Plus Urgent Care Center and found no fracture or dislocation. (*Id.*). In July 2012, Claimant underwent a series of MRI examinations of both his left ankle and left foot at Charleston Area Medical Center. (Tr. at 322-23, 325). The findings were consistent with bone marrow edema likely related to a post-traumatic change with a radiographically occult fracture or severe bone bruise. (Tr. at 325). The examining doctor reported no evidence of dislocation. (*Id.*).

On August 16, 2012 Claimant was seen by Jeffrey Shook, D.P.M., at Logan Regional Medical Center. (Tr. at 339). Dr. Shook related that Claimant had fallen on his left foot while swinging a sledgehammer at work. (*Id.*). Dr. Shook diagnosed Claimant's injury as a Lisfranc fracture-dislocation. (Tr. at 340). Dr. Shook advised Claimant to be non-

weightbearing on the injured foot and prescribed pain medications. (*Id.*). On August 31, 2012, Dr. Shook performed surgery to repair Claimant's injury. (Tr. at 343). Claimant was discharged on September 1, 2012. (Tr. at 347).

On September 2, 2012, Claimant arrived at Logan Regional Medical Center stating that he was experiencing intense pain and swelling following foot surgery. (Tr. at 330). On September 28, 2012, Claimant again presented to Logan Regional Medical Center with complaints of post-surgical foot pain. (Tr. at 360). Claimant was examined, given discharge instructions, and released. (Tr. at 361). On October 7, 2012, Claimant again arrived at Logan Regional Medical Center, complaining of post-surgical pain and pus leaking from his cast. (Tr. at 356). The treating physician, Geoffrey Hosta, M.D., documented that Claimant insisted on having his cast removed. (Tr. at 357). Dr. Hosta informed Claimant that to do this was contrary to the advice of Dr. Shook. (*Id.*). Dr. Hosta further noted that Claimant's wife "eavesdropped" on a telephone call between Dr. Hosta and Dr. Shook and misinterpreted the conversation. Claimant and his family subsequently became very upset and continued to demand removal of the cast. (*Id.*). Dr. Hosta indicated that Claimant had only been taking antibiotics for two days, and this was not long enough for the medicine to begin working. He advised Claimant that he saw no signs of infection and counseled him to wait before removing the cast. (*Id.*).

Dr. Shook followed up with Claimant on October 9, 2012. (Tr. at 355). Dr. Shook observed a "small very superficial area of dehiscence," but did not note any significant issues with recovery. (*Id.*). He documented that Claimant and his family "did not have a good visit" at the emergency room recently and told Claimant to lodge a formal complaint if he had any issues with the emergency room staff. (*Id.*). On October 23, 2012, Claimant was seen by Dr. Shook for postoperative follow-up. (Tr. at 351). Dr. Shook noted that

Claimant was recovering well. (Tr. at 352). He indicated that Claimant was continuing to drive a car against instructions, but the plan was to progress Claimant to walking with a boot after four weeks of recovery. (*Id.*).

Following this interaction, Dr. Shook was apparently either "fired" by Claimant, (Tr. at 410), or he left the area. (Tr. at 713). Claimant struggled to find another provider until 2013 when he began treatment with Timothy Donatelli, D.P.M. (Tr. at 713). On February 19, 2013, Claimant underwent a CT scan at Logan Regional Medical Center. (Tr. at 1110). Grant Petty, M.D., the examining radiologist, diagnosed a "Lisfranc fusion as above," but also noted that there was no evidence of fusion of the joints despite the August 31, 2012 surgery, which was intended to result in successful fusion. (*Id.*). Dr. Donatelli attempted to treat Claimant's pain with a bone stimulator, but this effort was unsuccessful. (Tr. at 714).

On April 1, 2013 Claimant presented to Comprehensive Health Solutions where he was assessed by Christopher Beckett, D.O. (Tr. at 726). Dr. Beckett found Claimant's gait and station to be within normal limits. (Tr. at 728). In a subsequent visit on May 15, 2013, Dr. Beckett again assessed Claimant's gait and station as normal and noted that Claimant was "able to stand without difficulty." (Tr. at 733).

Following Dr. Donatelli's unsuccessful attempt to treat Claimant's injury with a bone stimulator, Claimant was referred to Mark Wilt, D.P.M. (Tr. at 478, 714). On August 20, 2013, Claimant underwent surgery performed by Dr. Wilt. (Tr. at 400). The surgery consisted of a nonunion repair of Claimant's left foot, as well as hardware removal in the left foot. (*Id.*). Claimant was discharged on August 21, 2013. (Tr. at 404). Postoperatively, Claimant reported slight improvement in his pain symptoms. (Tr. at 1078, 1080, 1082, 1083.). Following a November 20, 2013 visit, Dr. Wilt planned to have Claimant progress

to wearing an athletic shoe with orthotics. (Tr. at 1078). However, by December 16, 2013, Claimant was reporting that his foot pain was worsening and that he had been experiencing acute pain for several months. (Tr. at 1075). Beginning on December 20, 2013, and continuing until January 10, 2014, Claimant began physical therapy at Logan Physical Therapy. (Tr. at 1018). He received seven treatments and reported high pain levels and little benefit. (*Id.*). Claimant continued to report worsening pain through March 2014. (Tr. at 1069-70, 1074). Dr. Wilt suspected that Claimant's pain might be related to retained hardware following the 2012 surgery, so on March 25, 2014, Dr. Wilt performed hardware removal surgery on Claimant's left foot. (Tr. at 1063). On April 7, 2014, Claimant reported that his pain symptoms had slightly decreased, but he was still experiencing continuing pain. (Tr. at 1061). On May 2, 2014, a CT scan showed a successful bony union following surgery, (Tr. at 964), although Claimant continued to report worsening pain through September 2014. (Tr. at 1045, 1047, 1050, 1055, 1056).

On July 26, 2014, Claimant underwent an NCS/EMG study that revealed peroneal nerve injury and injury of the left tibial nerve. (Tr. at 953). On August 8, 2014 Ethan Colliver, D.O. sent a letter to Dr. Wilt describing his evaluation of Claimant. (Tr. at 1002). Dr. Colliver stated that Claimant's symptoms appeared to limit his function to 60% capacity. (*Id.*). Dr Colliver recommended that Claimant begin physical therapy and receive lumbar sympathetic block injections. (*Id.*). Dr. Colliver surmised that Claimant might have a Complex Regional Pain Syndrome "related to his Worker's Compensation injury," and opined that Claimant was "certainly disabled" at this point. (*Id.*).

On September 3, 2014, Claimant had an MRI at Logan Regional Medical Center, which showed no focal or patchy edema of the bone marrow to suggest reflex sympathetic dystrophy. (Tr. at 958). The examination was limited, however, by metallic hardware that

remained in Claimant's foot. (*Id.*). On September 8, 2014, Claimant was given a joint diagnostic block injection in an attempt to cure his continuing pain. (Tr. at 1005). On September 24, 2014, Dr. Colliver sent another letter to Dr. Wilt reporting on a second operation performed on Claimant. (Tr. at 1016). Dr. Colliver stated that Claimant had experienced about 20% improvement in his symptoms after receiving a medial superficial peroneal nerve block injection, but this improvement dissipated after a couple of hours, and Claimant reported even worse pain following the procedure. (*Id.*). Dr. Colliver performed a left deep peroneal nerve block at the anterior ankle, followed by a left common peroneal nerve block at the fibular head. (*Id.*). Following the procedure, Claimant reported only 40-50% improvement in foot pain and complained that a significant portion of his foot continued to hurt. (*Id.*). Dr. Colliver noted that this included an area that would demonstrate sensory distribution of the peroneal nerve, and, therefore, Claimant's symptoms must be due to something other than peroneal nerve pain. (*Id.*).

On October 17, 2014 Jennifer O'Neal, D.P.T., sent a report to Dr. Wilt describing Claimant's physical therapy treatment progress. (Tr. at 1025). She stated that Claimant began his treatment on August 29, 2014, with a diagnosis of Complex Regional Pain Syndrome ("CRPS"). (*Id.*). Ms. O'Neal reported that Claimant saw minimal benefit from the program and recommended further evaluation. (*Id.*).

Claimant was next seen by Ahmet Ozturk, M.D., at Cabell Huntington Hospital's Pain Management Center on March 11, 2015, for a physical examination. (Tr. at 1173). Claimant reported continuing pain in his left foot, as well as difficulty sleeping and breathing. (Tr. at 1174-76). Claimant also indicated he had been diagnosed with depression and anxiety. (Tr. at 1175). Claimant estimated that he could walk for 10-30

minutes, stand for the same amount of time, and sit without limitation. (Tr. at 1176). Dr. Ozturk noted that Claimant used a cane to walk and had restricted movement in his left lower extremity. (Tr. at 1177). Dr. Ozturk's impression was that Claimant suffered from CRPS Type I and neuropathic pain associated with allodynia and hyperpathia. (Tr. at 1178). Dr. Ozturk planned to proceed with lumbar sympathetic block injections to treat Claimant's condition. (Tr. at 1178).

Lumbar sympathetic block injections were performed on April 21, 2015, and again on May 1, 2015. (Tr. at 1179-80, 1183-85). In a May 13, 2015 follow-up after the procedure, Claimant reported experiencing no pain relief from the injections. (Tr. at 1192). Dr. Ozturk reevaluated Claimant on June 4, 2015 in an effort to identify the source of his pain. (Tr. at 1195). Dr. Ozturk noted that the lumbar sympathetic block injections had failed to alleviate Claimant's symptoms and indicated that he planned to determine Claimant's eligibility for a spinal cord stimulator with the goal toward getting Claimant to a functional state and able to engage in gainful employment. (Tr. at 1196).

On August 6, 2015, Claimant was evaluated by Christopher Kim, M.D., at the Center for Pain Relief, at the request of Dr. Ozturk. (Tr. at 1540). Dr. Kim reported that Claimant showed early signs of CRPS, for which a spinal cord stimulator ('SCS") was the best treatment plan. (*Id.*). Accordingly, on October 7, 2015, Dr. Ozturk performed a SCS trial on Claimant. (Tr. at 1521). After the trial, Claimant reported improvement in his condition, so the decision was made to permanently implant the device. (Tr. at 1514-16). Dr. Ozturk noted that even with the SCS, Claimant was unlikely to be able to return to his previous job, but expected that Claimant would be able to return to work at the sedentary or light capacity after the SCS procedure. (Tr. at 1516).

On October 28, 2015, Claimant underwent SCS implantation surgery. (Tr. at 1492). On November 4, 2015, Claimant returned to the Cabell Huntington Hospital Pain Management Center for follow-up. (Tr. at 1497). Dr. Ozturk reported that the surgery went well and there were no complications. (Tr. at 1498). He stated that Claimant was now able to "perform sedentary/light work for employment." (*Id.*). At a second follow-up appointment on November 11, 2015, Claimant reported that he was experiencing pain relief while at rest, but increased pain while walking. (Tr. at 1499). On December 29, 2015, Claimant reported that the SCS implant was working, but he felt he needed it adjusted. (Tr. at 1504).

Claimant returned on January 26, 2016, and reported increased pain at night. (Tr. at 1505). Sherry Perry, F.N.P., performed a physical examination of Claimant. Nurse Perry noted that Claimant's gait was non-antalgic, and he could stand and walk unassisted. (Tr. at 1507). On February 24, 2016, Claimant presented with complaints of increased leg and foot pain. (Tr. at 1509). On examination, Claimant's gait was again observed to be non-antalgic, and he was able to stand and walk unassisted. (Tr. at 1511).

On March 11, 2016, Claimant presented to Logan Regional Medical Center with complaints of a persistent cough and shortness of breath. He was examined by James Endicott, M.D. (Tr. at 1445). Claimant reported that he had been to the ER several days earlier after passing out at home. (*Id.*). After running several tests, Claimant was discharged from the Emergency Room with no documented functional deficits. (Tr. at 1448).

On March 22, 2016, Claimant returned to Logan Regional Medical Center with complaints of shortness of breath and seizure activity. (Tr. at 1372). A chest x-ray did not reveal any acute findings; Claimant was discharged on March 23, 2016, but refused to

13

leave the hospital. (Tr. at 1372-74, 1388, 1391). Prasada Boppana, M.D., reported that Claimant's wife was upset and believed Claimant needed oxygen as he had passed out at home. (*Id.*). Dr. Boppana put Claimant on oxygen and made arrangements to have home and portable oxygen prepared for Claimant. (*Id.*). Dr. Boppana documented that Claimant's family was still upset and wanted more answers. He stated, per their request, that he would consult with Dr. Marzouk for further evaluation of Claimant's condition (*Id.*). Dr. Boppana thought Claimant's symptoms might be due to COPD with recurrent bronchitis and morbid obesity. (*Id.*). Kamel Marzouk, M.D., examined Claimant, charting that Claimant refused to leave until he was seen. (Tr. at 1388). Dr. Marzouk added that Claimant was hypoxic and had recently been treated for bilateral pneumonia. (*Id.*). During a physical examination, Dr. Marzouk observed that Claimant's ambulation was within normal limits. (Tr. at 1389). Dr. Marzouk felt that Claimant needed a neurological evaluation in order to determine the cause of the seizure reported by Claimant's wife. (Tr. at 1390). Dr. Marzouk also planned to assess Claimant for a possible pulmonary embolism or sleep apnea. (*Id.*). On March 26, 2016, after pulmonary embolism was ruled out as a cause of his symptoms, (Tr. at 1415), Claimant was discharged. (Tr. at 1372).

On May 18, 2016, Claimant was seen by Ashu Dhanjal, M.D., to determine the cause of his continuing chest pain and shortness of breath. (Tr. at 1276). Dr. Dhanjal noted that Claimant had recently had an echocardiogram that revealed a mildly enlarged right ventricle. (*Id.*). Dr. Dhanjal felt Claimant might have pulmonary hypertension. (Tr. at 1278). On June 7, 2016, Claimant underwent a left heart catherization which showed signs of mild nonobstructive coronary artery disease and normal left ventricular systolic function. (Tr. at 1281). Dr. Dhanjal recommended a sleep apnea study to rule out obstructive sleep apnea as the source of Claimant's symptoms. (*Id.*).

On June 26, 2016, Claimant participated in a sleep apnea study. (Tr. at 1330). The study was positive for severe obstructive sleep apnea syndrome. (*Id.*). Dr. Marzouk ordered a CPAP titration study following the results. (Tr. at 1331). On September 8, 2016, Claimant participated in a CPAP titration study. (Tr. at 1336). The study revealed improvement of Claimant's symptoms with BiPAP pressure of 18/9. (*Id.*). Dr. Marzouk ordered a BiPAP pressure machine for Claimant. (*Id.*). On October 26, 2016, Claimant visited Dr. Endicott who recorded that Claimant was now diagnosed with COPD, pulmonary hypertension, and severe obstructive sleep apnea. (Tr. at 1314-15).

On November 15, 2016, Claimant began seeing Fuad Zeid, M.D., for evaluation of progressive shortness of breath. (Tr. at 1476). Dr. Zeid reported that Claimant had experienced progressive dyspnea for approximately one year after being discharged from Logan General Hospital with bilateral pneumonia. (*Id.*). Claimant reported difficulty breathing and walking and an inability to climb any steep surface or steps. (*Id.*). Dr. Zeid noted that Claimant had quit working about 5 years earlier due to "progressive shortness of breath". (*Id.*). Dr. Zeid assessed Claimant's gait and station as within normal limits, but noted that Claimant reported limited mobility due to pain in his lower left extremity. (Tr. at 1476, 1479). Dr. Zeid diagnosed Claimant with progressive dyspnea with exercise limitation due to multifactorial causes, of which obesity was a significant contributing factor. (Tr. at 1480). He also noted that Claimant's severe sleep apnea had not yet been treated and suggested that Claimant undergo further testing to rule out pulmonary hypertension. (Tr. at 1480-81).

Claimant visited Dr. Zeid again on December 13, 2016. (Tr. at 1468). Dr. Zeid noted Claimant had yet to receive his BiPAP equipment ordered on September 8, 2016, but it was expected to be delivered soon. (*Id.*). Dr. Zeid again reported that Claimant had quit

his job due to difficulties breathing. (*Id.*). Dr. Zeid indicated that Claimant had trouble walking due to reflex sympathetic dystrophy. (Tr. at 1469). Dr. Zeid reiterated his opinion that Claimant's difficulties breathing were multifactorial with obesity being a significant factor. (Tr. at 1473). D. Zeid recommended that Claimant start BiPAP treatment when the equipment arrived and continued his use of daytime oxygen. (*Id.*).

On January 30, 2017, Claimant reported to Dr. Endicott for a check-up. (Tr. at 1328). Dr. Endicott assessed Claimant's motor strength and tone as poor, stating that Claimant had displayed a limited range of motion during his musculoskeletal exam. (*Id.*). Claimant reported to Dr. Endicott that he had received the results from the tests ordered by Dr. Zeid and had been informed that they did not explain his shortness of breath. (*Id.*). Claimant further reported that he had still not been able to use his CPAP machine. (*Id.*).

### B. Evaluations and Opinions

On March 10, 2014, Claimant underwent an Independent Medical Exam ("IME"), conducted by Bruce Guberman, M.D., in connection with Claimant's worker's compensation claim. (Tr. at 719). Dr. Guberman conducted a physical examination of Claimant and found weakness of the left foot and ankle, grading them at 4/5. (Tr. at 717). He concluded that Claimant was not yet at "maximum medical improvement" regarding his injury, and recommended waiting on the results of Dr. Wilt's proposed hardware removal surgery. (Tr. at 719).

On November 18, 2014, Claimant was given a second IME by Ramanathan Padmanaban, M.D. (Tr. at 1037). Dr. Padmanaban noted that Claimant walked with a cane and had an antalgic gait. (Tr. at 1034). Dr. Padmanaban gave Claimant a 4/5 grade in motor, power, and tone in his left foot and ankle. (*Id.*). Dr. Padmanaban opined that Claimant had CRPS in his left lower extremity. (Tr. at 1036). Dr. Padmanaban also stated

that he believed Claimant was not at his maximum medical improvement yet and would not be until he had undergone lumbar sympathetic blocks and a spinal cord stimulator trial. (*Id.*).

On November 11, 2014, Rogelio Lim, M.D., completed a Physical Residual Functional Capacity Assessment ("PRFC") at the request of the SSA. (Tr. at 94-96). Dr. Lim first determined that one or more of Claimant's medically determinable impairments could reasonably be expected to produce Claimant's symptoms. However, Dr. Lim did not believe that Claimant's statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence, and thus rated Claimant's statements about functional activities as only "partially credible." (Tr. at 94).

Dr. Lim determined that Claimant could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk about two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had unlimited ability to push and pull up to the weight limits Claimant could lift and carry. (Tr. at 95). Dr. Lim felt that Claimant had some postural limitations in that he could only occasionally climb ramps and stairs, never ladders, ropes, and scaffolds; and could only occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*). Dr. Lim did not feel that Claimant had any manipulative, visual, or communicative limitations, but thought he should avoid concentrated exposure to extreme heat and cold, humidity, wetness, vibrations, fumes, odors, dust, gases, poor ventilations, and hazards.

On March 5, 2015, William Waltrip, M.D., performed a physical examination at the request of the SSA and submitted his opinion on Claimant's functional abilities to the West Virginia Disability Determination Office in Charleston, West Virginia. (Tr. at 1116-

19). Dr. Waltrip found Claimant to have normal breath sounds, with lungs clear to auscultation and percussion. (Tr. at 1117). Claimant walked with a limp favoring his left lower extremity and used a cane, but had no loss of motor strength or sensation to fine touch. (Tr. at 1118). Claimant could not heel-to-toe walk, tandem walk, walk on the tips of his toes, walk on his heels, or knee squat. An x-ray of his left foot showed multiple fractures that were well-healed with a screw in the first metatarsal bone. There was no irregularity of the surface of the joint areas. (*Id.*). In summary, Dr. Waltrip found Claimant to be "rather markedly limited in his ability to walk, stand, or sit for any protracted periods of time." (Tr. at 1118). Nonetheless, Dr. Waltrip believed that Claimant had good grip strength, could perform gross and fine manipulations, was able to "lift objects of 35 to 40 pounds without limitation" and displayed no "motor dysfunction, sensory loss, or reflex abnormalities." (Tr. at 1119). Dr. Waltrip also indicated that Claimant displayed "marked" obesity. (*Id.*).

Caroline Williams, M.D., completed a second PRFC on March 11, 2015 for Claimant's disability determination at the reconsideration level. (Tr. at 110-13). Dr. Williams agreed with Dr. Lim's assessment that Claimant could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and sit for about six hours in an eight-hour workday. However, Dr. Williams felt that Claimant was capable of standing or walking for up to six hours in an eight-hour workday in contrast to the two hours assessed by Dr. Lim. (Tr. at 110). Dr. Williams believed Claimant displayed limitations in his ability to perform repetitive push or pull motions with his lower left foot. (Tr. at 111). Dr. Williams agreed with Dr. Lim's assessment of Claimant's postural limitations. She found that Claimant did not display any manipulative, visual, or communicative limitations, but that he did have environmental limitations in that he should avoid concentrated exposure

to extreme cold and heat, wetness and vibrations, and avoid even moderate exposure to hazards. (Tr. at 111-12). Dr. Williams thought Claimant could handle unlimited exposure to fumes, odors, dust, gases, poor ventilations, and noises. (Tr. at 112).

On May 14, 2015, Claimant had a final IME for his worker's compensation claim, conducted by Robert Walker, M.D. (Tr. at 1129). Dr. Walker performed a physical examination and found that Claimant's left ankle revealed significantly less flexibility than his right ankle, as well as displaying differing coloration and temperature. (Tr. at 1125). Dr Walker concluded that Claimant had symptoms that were "active but stable," and had reached maximum medical improvement. (Tr. at 1127). Dr. Walker assessed Claimant's work injury as leaving him with a whole person impairment of 7%, consisting of a 6% impairment due to his ankle injury and a 1% impairment resulting from a contusion of his elbow that he suffered in the same work-related fall. (Tr. at 1128).

Dr. Endicott wrote a letter on October 27, 2016, that stated Claimant was "totally and permanently disabled for any occupation" due to the severity of his diseases and his reliance on oxygen 24 hours a day. (Tr. at 1213.) On April 3, 2017, Dr. Endicott completed a PRFC Questionnaire for Claimant. (Tr. at 1565). Dr. Endicott indicated that Claimant suffered from severe oxygen dependent COPD, severe obstructive sleep apnea, and chronic pain. (*Id.*). Dr. Endicott stated that Claimant was "completely disabled for any occupation." (Tr. at 1566). However, he declined to explain the reasons for his conclusions in the space provided by the questionnaire. (*Id.*). Dr. Endicott opined that Claimant was able to sit and stand for periods of 10-15 minutes before needing to change positions. (Tr. at 1567). He felt that Claimant could sit for a total of 4 hours in an 8-hour workday, and stand or walk for less than two hours in the same period. (Tr. at 1567). Dr. Endicott marked that Claimant was capable of only occasionally lifting ten pounds or less, rarely

19

lifting twenty pounds and never lifting fifty pounds. (Tr. at 1568). Dr. Endicott again simply indicated that Claimant was disabled in response to several questions that asked about Claimant's functional abilities. (Tr. at 1567-69).

### C. Claimant's Statements

On August 8, 2014, Claimant completed an Adult Function report. (Tr. at 246-53). In the report, Claimant stated that he was unable to stand for longer than 15-20 minute periods, go up the stairs, or walk over uneven ground. (Tr. at 246). Claimant described his typical daily activities as consisting of taking his medications, sitting in the recliner and watching television, talking with family members and going to therapy or doctor's appointments. (Tr. at 247). Claimant indicated that he was able to load the dishwasher twice a week, drive for short distances, and grocery shop about once a week, depending on the availability of riding carts at the grocery store. (Tr. at 248-49). Claimant stated that he continued going to church on Sundays, but had become much more withdrawn since the accident at work. (Tr. at 249-50).

Claimant testified at the administrative hearing held on April 4, 2017, that he hurt his foot in June 2012 while working for Coal River Energy when he fell while swinging a sledgehammer. (Tr. at 42-43). Claimant testified that he continued to work for Coal River Energy in a light duty capacity until his termination March 1, 2013. (Tr. at 46-47). When asked why he was terminated, Claimant responded because "they shut the mines down." (Tr. at 47). However, on further questioning, Claimant stated that he had been unable to continue working prior to the mine shutting down due to his inability to make the long commute to work in his condition, and the difficulties he experienced in remaining seated for the eight-hour workday. (Tr. at 47-48).

Claimant testified that he had difficulty standing for more than ten minutes before

having to either move or sit down. (Tr. at 53). He stated that with his cane, he could walk for approximately fifteen minutes at a time. (*Id.*). Claimant asserted that he was not able to stand or walk very well without his cane. (Tr. at 53-54). Claimant estimated he spent about six to seven hours in an eight-hour period sitting in his recliner with the need to constantly get up and move to stave off pain. (Tr. at 58). He was able to help load the dishwasher (Tr. at 55-56). Claimant also reported that approximately once or twice a week, he was unable to get out of bed at all due to an inability to put pressure on his foot without extreme pain. (Tr. at 60).

### D. Testimony of the VE

At the Hearing, both the ALJ and Claimant's attorney posed a series of hypothetical questions to the VE. The ALJ first asked the VE to consider an individual with Claimant's age, education, and work experience, who was limited to being able to lift and carry 20 pounds occasionally and 10 pounds frequently; was limited in his ability to use foot controls with the left foot; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, but never climb ladders, ropes, or scaffolds; could never work at unprotected heights or around moving mechanical parts; could not operate a motor vehicle; and could occasionally work in odor, humidity, wetness, dust, fumes, and extreme cold, heat and vibration. (Tr. at 66-67). The ALJ asked the VE if, based on his professional expertise, such an individual would be able to find employment in the national economy. (Tr. at 67). The VE replied that an individual with those limitations would be able to work at the light level and consequently would be able to find jobs in the national market. (*Id.*).

The ALJ then asked the VE to consider an individual with all the same limitations as the previous hypothetical, except that this individual would be only able to walk or stand for up to two hours in an eight-hour workday. (Tr. at 68). The VE testified that an

individual with those characteristics would be relegated to sedentary work, but would still be able to compete for a significant number of jobs in the national market. (*Id.*). After conferring with Claimant about his oxygen and cane usage, the ALJ then asked the VE to consider a third hypothetical individual. (Tr. at 68-70). This individual would have all the same limitations as the second hypothetical, but would also require an assistive device to walk and would need to use oxygen constantly. (Tr. at 70). The VE opined that such an individual would be able to perform the same sedentary work as the individual in the second hypothetical. (Tr. at 70-71).

Under questioning from the ALJ, Claimant testified that his oxygen tank likely weighed about ten pounds. (Tr. at 71). Claimant further clarified that he personally carried his oxygen tank, rather than relying on an oxygen carrier with wheels, and also used his cane when he walked. (*Id.*). The ALJ then asked the VE to consider a scenario where the individual from the last hypothetical was also off task for 10% of the workday and absent from work two days a month. (*Id.*). The VE felt that a person with those limitations would not be employable due to their absence rate. (Tr. at 71). Claimant's attorney followed up the ALJ's questioning with the following exchange:

> **Atty**: So [VE] if someone requires use of oxygen and needs to bring a portable oxygen tank to work, you don't consider that an accommodation?
>
> **VE**: Yeah, that could be an accommodation. Some employers would not perhaps permit that, but the sedentary work was basically office work that I gave in hypo 2 I think would allow that normally.
>
> **Atty**: Okay.
>
> **VE**: But, yeah, it could be considered, I guess, an accommodation.
>
> **Atty**: Okay. I'm just wondering about, you know, liability bringing an oxygen tank into the workplace with, you know, possible someone falling over it, tripping over it, explosions if there would be any type of liability, and most employers wouldn't allow that without making a special

accommodation. That was why I was asking.

**VE**: Right.

(Tr. at 72). Claimant's attorney asked the VE to consider the ALJ's first hypothetical individual, designated by the VE as able to work at the light capacity, and add as a additional limitation solely the use of the cane for ambulation. The VE replied that such an individual would be regulated to sedentary work. (Tr. at 72-73). Claimant's attorney then asked the VE the following:

> **Atty**: '[I]f we had a person at a--the sedentary RFC, but they would only be able to -- they could not use foot controls at all of their left foot because any kind of pressure is very painful. They could stand for 10 minutes at a time. They can maybe lift 5 or 6 pounds. They could walk maybe 10 to 15 minutes at a time with a cane. They'd be able to sit about 45 minutes before they would need to have to stand and/or walk for 10 minutes. Would that sit, stand frequency have any effect on sedentary jobs?

(Tr. at 73). The VE replied that an individual who had these limitations would have to be able to work while standing, or otherwise would be off-task too frequently to maintain employment. (Tr. at 73). Under further questioning by the ALJ, the VE clarified that, assuming the individual could stay on task while standing, the limitations identified by Claimant's attorney would not prevent such an individual from being able to find employment in the national economy. (Tr. at 73-74).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to

justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.    Discussion**

Claimant argues that the ALJ erred by failing to acknowledge the VE's testimony that Claimant's oxygen tank would require a special accommodation from employers. (ECF No. 12 at 8). Claimant contends that the law is well-settled that an ALJ may not consider the possibility of "reasonable accommodations" under the ADA when making a disability determination. (*Id.* at 8-9). Therefore, the ALJ inappropriately relied on the VE's opinion that Claimant was employable, as that opinion clearly rested on the presumption that Claimant would be granted an accommodation under the ADA. (*Id.* at 10).

As Claimant explains, in determining his RFC, the ALJ found that Claimant needed to use oxygen constantly. To have oxygen available constantly, Claimant was required to carry a portable oxygen tank. The VE conceded that allowing an employee to bring a portable oxygen tank to work constituted an "accommodation." As such, without

the accommodation, Claimant could not have oxygen available and, without continuous oxygen, would not be physically capable of working.

As a second line of attack, Claimant argues that the ALJ also failed to consider the mechanics of carrying an oxygen tank and using a cane on Claimant's ability to do the work identified by the VE. (*Id.*). Claimant points to testimony by the VE indicating that even at the sedentary level, an individual would be expected to continue working while standing, and if the individual could not work two-handed because of the use of a cane, the individual would be unable to maintain employment even at the sedentary level. (ECF No. 12 at 10-11). It is only logical, Claimant asserts, that if he has to use a cane in one hand and carry a portable oxygen tank in his other hand when he is standing, he will not be able to work two-handed. In Claimant's view, the ALJ entirely failed to consider the VE's testimony concerning the effect of these particular limitations on Claimant's ability to work. (*Id.* at 11).

### A. The VE's Accommodation Testimony

Claimant's argument that the inclusion of a "reasonable accommodation" under the ADA invalidates the ALJ's reliance on the VE's testimony is based largely on the United States Supreme Court's ruling in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). (ECF No. 12 at 8-9). In that case, the Supreme Court considered whether an employee who filed a claim for DIB, alleging that she was unable to work, should later be permitted to file a lawsuit against her employer under the ADA, which required her to prove that she would have been able to perform the "essential functions of the job" with reasonable accommodation. *Cleveland,* 526 U.S. at 797. The Supreme Court declined to "erect a strong presumption" against success under the ADA for a recipient of Social Security disability insurance benefits ("SSDI"). *Id.* at 797-798. The Supreme Court

reasoned that differences between the approach under a Social Security disability determination, which is constrained by the "need to administer a large benefits system efficiently," and the ADA, which is more able to consider the "special individual circumstances" of each case, meant that a determination by the SSA that an individual is disabled should not necessarily preclude that individual from later showing she "could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id.* at 804, 807 (internal quotation marks omitted).

Claimant additionally points to a Fourth Circuit case which states "when the [SSA] determines whether an individual is disabled for SSDI purposes, it does not take the possibility of reasonable accommodation into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." *Rossum v. Baltimore Cty., Maryland*, 178 F. Supp. 3d 292, 297 (D. Md. 2016) (internal quotations and citations omitted). Claimant argues that the language in this case, as well as several other circuit court decisions with similar findings, supports his conclusion that it is improper for an ALJ to consider the possibility of reasonable accommodations under the ADA when determining disability. (ECF No. 12 at 9).

The undersigned **FINDS** Claimant's argument unpersuasive, however, because the cases cited simply are not on point. Rather than addressing the role of accommodations in a Social Security disability proceeding, the cases cited by Claimant address whether a plaintiff suing for disability discrimination under the ADA is judicially estopped from claiming that he would be capable of performing the essential functions of his job, with accommodation, when he has already asserted that he is disabled in an SSI or DIB proceeding. *See Rossum*, 178 F. Supp. 3d at 298 (ADA claim was not inconsistent with SSDI application); *Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376, 382 (6th Cir.

1998) (judicial estoppel did not apply to ADA claim). While these cases stand for the proposition that SSDI applications do not always result in judicial estoppel for a later ADA claim, they say nothing about whether it is improper for an ALJ to consider testimony in any individual SSDI case regarding the prevalence of accommodations in the workplace. Finding that the SSA, as a general rule, does not consider the possibility of accommodations under the ADA when reaching a disability determination is not at all the same as holding that doing so is *impermissible* in every case*.*

Claimant does cite to one circuit court case that considers the applicability of the ADA to a disability determination; however, that case undermines, rather than supports, his claim. *See Jones v. Apfel,* 174 F.3d 692 (5th Cir. 1999). (ECF No. 12 at 9). In *Jones v. Apfel*, the Fifth Circuit considered whether an ALJ erred when he relied on testimony by a VE that specific jobs existed that the claimant could perform and that would accommodate the claimant's need to alternate between sitting and standing. 174 F.3d at 693. Claimant points out that the *Jones* Court stated "a vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employer to accommodate an individual's disability." *Id.* (ECF No. 12 at 9). Nevertheless, the Fifth Circuit went on to find that no such improper reliance was present, because the VE mentioned the ADA merely to suggest that "allowing for an employee to alter between sitting and standing is a prevalent accommodation in the workplace." *Jones*, F.3d 692 at 694.

Recently a court in the Fourth Circuit was asked to consider the same question presented here when the claimant argued that the ALJ's decision should be overturned as "the SSA cannot take a reasonable accommodation into account when making a disability determination." *Collins v. Berryhill*, No. 3:17-CV-633 2018 WL 4232888, at *7 (E.D. Va.

Aug. 20, 2018), report and recommendation adopted, No. 3:17-CV-633 (MHL), 2018 WL 4224854 (E.D. Va. Sept. 5, 2018). The Eastern District of Virginia rejected the claimant's contention that, because the VE had testified that sedentary jobs would accommodate the claimant's need to alternate between sitting and standing, the ALJ was barred from relying on that testimony. *Id.* The *Collins* Court found that "[n]owhere [in the applicable law] does it state, or even suggest, that the inclusion of a 'reasonable accommodation' under the ADA in an ALJ's hypothetical question renders that hypothetical invalid." *Id.* at 8.

In any event, the VE in the instant action did not testify that employers would be bound by the ADA to make a special accommodation for Claimant. Instead, when questioned by Claimant's attorney as to whether he would consider Claimant's use of an oxygen tank to be an "accommodation" the VE replied that it "*could*" be considered an accommodation, but explained that jobs in the sedentary "office work" category, which the VE had listed in response to the second and third hypothetical scenarios, "would allow that normally." (Tr. at 72). Accordingly, the VE was merely noting that the type of accommodation required by Claimant was routinely permitted in the relevant job category. Put simply, the VE's testimony described a "broad vocational pattern" relevant to the assessment of jobs available to Claimant, which was an entirely appropriate consideration in the disability analysis. *See Jones,* F.3d 692 at 694. Courts have frequently upheld ALJ decisions, which rely on a VE's determination that certain accommodations are generally allowed by employers. *See Higgins v. Comm'r, Soc. Sec. Admin.*, 898 F.3d 793, 796 (8th Cir. 2018) ("[t]hese cases merely demonstrate that ALJs may properly rely on VE testimony that a certain needed modification is part of the functional workplace. It makes no difference that a particular workplace modification, such as a bariatric chair,

might be called an 'accommodation' or even a 'reasonable accommodation.'"); *see also Martin v. Berryhill*, No. CV 1:16-3741-SVH, 2017 WL 3446573, at *14-15 (D.S.C. Aug. 11, 2017) (finding that the ALJ did not err when he relied on the VE's testimony to find that jobs would generally accommodate claimant's restriction); *Golini v. Astrue*, No. 2:10-CV-525, 2011 WL 4409223, at *6 (E.D. Va. Aug. 16, 2011), report and recommendation adopted, No. 2:10-CV-525, 2011 WL 4408789 (E.D. Va. Sept. 20, 2011), aff'd, 483 F. App'x 806 (4th Cir. 2012); (the ALJ correctly used the VE testimony to determine that many light jobs would be able to accommodate the claimant's need to switch between sitting and standing frequently); *McElmurray v. Colvin*, No. CIV.A. 2:13-189-MGL, 2014 WL 607503, at *3 (D.S.C. Feb. 18, 2014) (ALJ may consider a VE's testimony that certain limitations are, based on their vocational experience, generally accommodated in the marketplace); *Harris v. Colvin*, No. 3:12-CV-2302, 2013 WL 4517866, at *4 (N.D. Ohio Aug. 21, 2013) ("the VE's response to the ALJ's hypotheticals reflected his professional opinion on common workplace accommodations—not formal accommodations that must be requested under the ADA.").

As the Commissioner points out, (ECF No. 13 at 9), this Court has considered a similar issue and found that it was not impermissible to rely on a VE's determination that the type of accommodation required by the claimant was "typically tolerated" by a significant number of employers. *Richards v. Colvin*, No. 2:14-CV-26508, 2015 WL 8489032, at *6 (S.D.W. Va. Oct. 7, 2015), report and recommendation adopted, No. CV 2:14-26508, 2015 WL 8492761 (S.D.W. Va. Dec. 10, 2015) (remanded on other grounds). Here, as in *Richards*, the VE was not testifying that Claimant's limitations would require a formal accommodation; he merely opined that Claimant's limitations were of the type generally accepted by employers in an office setting with clerical positions. (Tr. at 73).

Accordingly, the undersigned **FINDS** that the ALJ did not commit reversible error by relying on the VE's testimony that a hypothetical individual with Claimant's limitations would be able to find employment in an office setting in the national marketplace. To the contrary, the ALJ correctly applied Social Security rules and regulations in evaluating the availability of jobs that Claimant was capable of performing despite his functional limitations.

### B. Claimant's Inability to Work While Standing

In his second challenge, Claimant contends that the Commissioner's decision should be reversed because the ALJ failed to consider Claimant's inability to work while standing due to his reliance on both a cane and oxygen tank. (ECF No. 14 at 2, 4-5). To this end, Claimant points outs that his portable oxygen tank weighs about ten pounds and that he carries the tank while standing and walking. (*Id.* at 5). Claimant argues that it is not "logical" for the ALJ to accept the VE's testimony that an individual who is dependent on a cane, and who must simultaneously carry a ten-pound oxygen tank, is capable of satisfying the demands of light or sedentary work. (*Id.* at 2).

The ALJ determined at step five that Claimant could perform "light work" with additional restrictions, including the use of an assistive device to walk, the constant use of oxygen, and the inability to stand or walk for more than two hours in an eight-hour day. (Tr. at 23). At the administrative hearing, the ALJ offered the VE several hypothetical questions involving an individual with varying levels of functional limitations. The third hypothetical question described an individual with the same vocational background, education, and characteristics of Claimant, but who could do less than a full range of light level exertional work. This third hypothetical individual had all of the same functional limitations outlined in Claimant's RFC finding, including the need for constant oxygen

and a cane for ambulation. (Tr. at 66-70). It is significant to note that Claimant has never challenged the accuracy or adequacy of the RFC finding.

Upon considering the third factual scenario, the VE testified that this hypothetical individual, whose RFC was identical to Claimant's RFC, was capable of performing sedentary work. (Tr. at 68-70). The VE testified that an individual with the same limitations and vocational characteristics as Claimant could work as a charge account clerk, with 81,000 positions available in the national market; a telephone quotation clerk, with 75,000 positions available in the national market; and as a document preparer, with 120,000 positions available in the national economy. (Tr. at 68). These were the same three representative occupations that the ALJ listed in support of his determination that Claimant was not disabled. (Tr. at 29). As such, the ALJ's conclusion that Claimant could find employment in the national economy was supported by the testimony of the VE, which in turn was based upon a hypothetical question that reflected all of Claimant's proven limitations. A hypothetical question is "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record").

As demonstrated by the above discussion, Claimant's second challenge is without merit, because it is premised on evidence that does not exist in the record. Claimant contends that as he would need to use one hand for his cane, and one hand for his oxygen tank, he would be unable to perform work while standing or walking. (*Id.* at 4). Given the VE's testimony that an individual who was unable to work for two hours a day while standing would not be able to maintain employment, Claimant argues, the ALJ could not

have reasonably concluded Claimant would be able to maintain employment. (*Id.* at 4-5).

However, this reasoning presumes that the record necessarily established that Claimant could not perform work while standing or walking. It further presumes that the jobs selected by the VE required Claimant to walk and stand while carrying his oxygen tank and using a cane. However, evidence supporting those presumptions is absent from the record. To the contrary, according to the Dictionary of Occupational Titles, all three of the jobs identified by the VE were categorized as clerical positions, primarily requiring desk work and telephone communications. *Dictionary of Occupational Titles, (4th Ed., Rev. 1991)* §§ 205.367-014; 237.367-046; 249.587-018. Consequently, the demands placed on Claimant while standing and walking at work would likely be no greater than those experienced by him at home as described in his testimony. (Tr. at 58). When asked how much time he spent reclining at home in an eight-hour period, Claimant stated: "Probably six or seven hours because I have to, you know, constantly get up and move a little bit and then set [sic] back down." (*Id.*).

The ALJ specifically asked the VE to clarify his answer to Claimant's attorney that an individual unable to work while standing would be unable to maintain employment at the earlier identified sedentary occupations, asking, "if the person could—with all those limitations could stay on task that would still be acceptable?" The VE replied affirmatively. (Tr. at 73-74). The ALJ ultimately determined that Claimant was in fact capable of performing the representative occupations indicated by the VE. (Tr. at 29, 68). Notwithstanding Claimant's assertions that the VE's reply was illogical and the ALJ's determination was baseless, the undersigned **FINDS** that the record substantially supports the conclusions reached by the VE and the ALJ.

First, the testimony by the VE undercuts Claimant's argument that his use of both

a cane and an oxygen tank precludes him from performing the minimal lifting and carrying requirements of the sedentary jobs identified by the VE. When a hypothetical posed to a VE accurately encapsulates a claimant's RFC and presents "a fair description of all the claimant's impairments" it is appropriate for the ALJ to rely on that testimony in determining the claimant's RFC. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) *see also Clemons v. Astrue*, No. 3:10-CV-101, 2011 WL 900142, at *9 (E.D. Va. Jan. 6, 2011), report and recommendation adopted, No. 3:10-CV-101, 2011 WL 1313425 (E.D. Va. Mar. 11, 2011) ("The Commissioner can carry his burden in the final step with the testimony of a VE."). The ALJ specifically asked the VE in the third hypothetical question if an individual with all of Claimant's limitations, including the need to use a cane and oxygen constantly, as well as being unable to stand for more than two hours a day or sit for six hours per day, would be able to find employment in the sedentary occupations the VE had mentioned previously. (Tr. at 66-70). The VE replied affirmatively. (Tr. at 70). The VE in this case was well-trained, well-qualified, and very experienced, with more than forty years spent in vocational counseling and job placement. (Tr. at 310-14). Moreover, Claimant's attorney stipulated to his qualifications without hesitation. (Tr. at 61). The VE confirmed that his testimony was fully consistent with the Dictionary of Occupational Titles. (*Id.*). Thus, the ALJ justifiably relied on the VE's testimony in concluding that Claimant was capable of working at specific positions available in significant numbers in the national economy. (Tr. at 29).

Second, the record shows that Claimant had been prescribed other assistive devices that presumably would not require the constant use of his hand while standing and walking. Claimant testified that he had first been prescribed a "walker" which he described as a "little dolly that you put your knee on." (Tr. at 69). He stated that he didn't

like to use the walker device, apparently because it was not suitable to where he lived, and that he was then told he could use a cane instead. (*Id.*). With the use of this walker device described by Claimant, he would not be required to use his hand at all times while standing and it would represent an alternative assistive device that would allow him to work while standing.

Additionally, the record shows that even with the use of a cane and oxygen Claimant was able to do some work at home while standing. In both his Adult Function Reports, and in testimony at the hearing, Claimant stated he would unload the dishwasher about twice a week. (Tr. at 55-56; 248). Claimant stated it would take him approximately 30-40 minutes to do this activity and it involved a lot of bending over. (*Id.*). As the record shows Claimant was able to perform tasks while standing for 30-40 minutes at a time, the ALJ's determination that he would be able to continue to perform work while standing was not unsupported by the record.

Finally, simply because Claimant chose to carry his oxygen tank by hand at the time of the hearing, it does not follow that he must always do so and would be unable to find any alternative method. As indicated by the ALJ's question of whether Claimant had "something on wheels to carry [the oxygen tank]," oxygen cart tanks and backpack carriers are widely commercially available and are viable alternatives to carrying an oxygen tank by hand. In addition, if Claimant is standing merely in order to change positions, rather than to fulfill his job duties, there is no reason for him to hold or carry his oxygen tank at all. The tank can simply rest on the floor by his work station, or sit on the desk.

Claimant's contention that he would be unable to do the work required by the representative occupations, when standing, is based entirely upon conjecture. The

converse position can just as easily be envisioned. For example, the position of telephone quotation clerk requires workers to answer telephone calls, relay calls, and call customers. *Directory of Occupational Titles (4th Ed. Rev. 1991)* § 237.367-046. With the assistance of headphones and Bluetooth devices, this job could be performed virtually hands free. Therefore, as viable alternatives are available to Claimant that would free his hands for work activities, and he offers no evidence in the record to refute the VE's testimony, the undersigned **FINDS** Claimant's second challenge to the ALJ's decision to be equally without merit.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge

for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  December 6, 2018

Cheryl A. Eifert
United States Magistrate Judge